605 P.2d 895

**BELL ROAD MINI STORAGE,**
Petitioner Employer,

**State Compensation Fund, Petitioner Carrier,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Gilbert H. Fargen, Deceased, Mildred Fargen, Widow, Respondent Employee.**

No. 14482–PR.

Supreme Court of Arizona, En Banc.

Jan. 15, 1980.

Robert K. Park, Chief Counsel, State Compensation Fund by Arthur B. Parsons, Phoenix, for petitioners employer and carrier.

John H. Budd, Jr., Chief Counsel, The Industrial Commission, Phoenix, for respondent.

Jerome & Gibson by D. A. Jerome, Don A. Fendon, Phoenix, for respondent employee.

STRUCKMEYER, Chief Justice.

This petition for review was brought by Mildred Fargen, widow of Gilbert H. Fargen, to vacate the memorandum decision of the Court of Appeals, No. 1 CA–IC 2050, filed June 7, 1979. We accepted review. See A.R.S. § 12–120.24 and Rule 23, Rules of Civil Appellate Procedure, 17A A.R.S. Award of the Industrial Commission set aside.

Gilbert H. Fargen and his wife, Mildred Fargen, were employed as co-managers of the Bell Road Mini Storage. Their job included some light maintenance work. Occasionally Gilbert Fargen was called upon to remove and replace corrugated metal partitions from between lockers. Each cor-rugated metal sheet weighed eleven pounds and just prior to Gilbert Fargen's death he had been moving these corrugated metal sheets, two at a time.

Mildred Fargen filed a compensation claim for death benefits, which was denied by the carrier, and a formal hearing was held. The hearing officer found that Gilbert Fargen's death was causally related to his employment, and entered an award for death benefits. The employer brought a petition for review in the Court of Appeals, which court set aside the award in a memorandum decision, concluding after examination of the evidence that the record did not support the conclusion that Gilbert Fargen's death was causally related to his employment. We granted Mildred Fargen's petition for review of the decision of the Court of Appeals.

Nearly twenty-five years ago, in *Phelps Dodge Corporation v. Cabarga*, 79 Ariz. 148, 285 P.2d 605 (1955), we held that where the usual exertion of employment precipitates a heart attack it is compensable under the Workmen's Compensation Act of this State. We also held that the exertion, whether usual or unusual, must be of such a character that the injury can be traced to it with reasonable assurance that the work caused or contributed to the injury, saying:

"There must be a recognizable, causal connection. The requirements of the statute will not be fulfilled merely because the employee dies on the job while doing some causal or physically inconsequential thing   *   *   *"

Other than the death certificate, which stated the cause of death as being "acute coronary insufficiency", the only testimony relative thereto was given by Paul M. Bindelglas, M.D., a psychiatrist. He had treated Gilbert Fargen for an unrelated emotional problem in May of 1977. At that time an EKG revealed a "right bundle branch block", seemingly an abnormality of the heart arterial system. An extensive hypothetical question was posed to Dr. Bindelglas:

"Q. * * * Doctor, based on the medical data that you have here, your treatment and examination of this patient at Camelback Hospital, do you have an opinion within a reasonable degree of medical certainty or probability based upon your medical education, your experiences, your treatment of Mr. Fargen, as to whether the conditions you've set forth were sufficient to aggravate, precipitate or hasten his underlying or coronary problem to an acute coronary insufficiency, which ultimately resulted in his death? Do you have an opinion?"

Dr. Bindelglas testified that he did have an opinion and that:

" * * * Now, I don't know what the final diagnosis was, whether it was another acute coronary, whether it was in the same area, but just dealing within that general way on a hypothetical, it is possible it could have contributed."

Counsel then stated that his question was not whether it was possible, but "[w]as it probable to a reasonable degree of medical certainty . . . " To this, the witness answered:

"Let me put it this way: A lot would depend on whether on, say, autopsy there was another coronary, and if it were in a different place, in a different area, it's unrelated specifically to that pathology. If nothing specifically was found that was different, but he had coronary insufficiency and died, this, in my mind, is a reasonable probability that it happened the way you said."

Dr. Bindelglas obviously refused to say that it was probable that the work which he was engaged in at the time of his death was the cause of his death. What he did say was that a lot would depend upon whether an autopsy established that there was another coronary, and if it was in a different area than the right bundle branch block which already existed, and that if nothing was found that was different, in his mind there would be a reasonable probability that it happened "the way you said", meaning that it was work-related.

Dr. Bindelglas' testimony falls far short of satisfying the claimant's burden of proof of establishing to a reasonable probability that Gilbert Fargen's death was work-related. The most he would say is, as he did say, "it is possible it could have contributed", meaning that the work was one of the things which could have caused his collapse. Dr. Bindelglas did not even say that it was more likely his work caused Gilbert Fargen's death. The reason is obvious. It is simply because, lacking an autopsy, Dr. Bindelglas did not know what had occurred to Fargen's heart.

Award set aside.

HOLOHAN, V. C. J., and HAYS and GORDON, JJ., concur.

CAMERON, Justice, dissenting.

I regret that I must dissent.

Gilbert H. Fargen and his wife Mildred Fargen were employed as co-managers of Bell Road Mini Storage. Their duties were mostly administrative and included public relations, contract preparation, locker renting and rent collection. The job also involved some light maintenance work, primarily changing hasps on lockers with an electric screwdriver, opening and closing the gates once a day, and "policing the area." Occasionally, Mr. Fargen was called upon to remove corrugated metal partitions from between lockers to enlarge the locker space. In the year in which he was employed by petitioner, Mr. Fargen moved approximately eighteen of these sheets, each of which weighed approximately eleven pounds. Their removal consisted of removing several screws with an electric screwdriver and transporting them via a golf cart to the storage shed. On 14 September 1977, while moving six such sheets, Mr. Fargen became dizzy and collapsed. He died shortly thereafter. The death certificate listed acute coronary insufficiency as the cause of death. No autopsy was performed.

At the formal hearing held before an Industrial Commission hearing officer, Mrs. Fargen testified as follows:

"Q Now, you started off saying, 'We did this.' Did you do it or did Mr. Fargen do it?

"A  Mr. Fargen did it.  He would not allow me to lift the steel.

"Q  And would you classify this type of work insofar as Mr. Fargen was concerned?

"A  I would say for him it was heavy work.  He's been in the administrative field all his life as long as he's been working."

The only medical testimony at the hearing was from Dr. Paul M. Bindelglas, a psychiatrist who had treated Mr. Fargen for non-related emotional problems in May of 1977.  An EKG performed at that time revealed a "right bundle branch block," an abnormality in the heart arterial system.  Dr. Bindelglas did not see Mr. Fargen after his release from the hospital in May of 1977, some four months prior to the coronary insufficiency.

Counsel for Mrs. Fargen posed to Dr. Bindelglas an extensive hypothetical question concerning the events that occurred prior to Mr. Fargen's heart failure:

"Q  *  *  *  Doctor, based on the medical data that you have here, your treatment and examination of this patient at Camelback Hospital, do you have an opinion within a reasonable degree of medical certainty or probability based upon your medical education, your experiences, your treatment of Mr. Fargen, as to whether the conditions you've set forth were sufficient to aggravate, precipitate or hasten his underlying or coronary problem to an acute coronary insufficiency, which ultimately resulted in his death?  Do you have an opinion?

*    *    *    *    *    *

"THE WITNESS:  Yes.

*    *    *    *    *    *

"MR. JEROME:  All right.  You may answer, Doctor."

After a discussion of the condition of the decedent, Dr. Bindelglas stated:

"A  *  *  *  Now, I don't know what the final diagnosis was, whether it was another acute coronary, whether it was in the same area, but just dealing within that general way on a hypothetical, it is possible it could have contributed.

"Q  My question, Doctor, was not possible.  Was it probable to a reasonable degree of medical certainty whether this—all this activity, the work activity and the prior history that you had, and that I elicited to that's in the file?  The question was was it to a reasonable degree of medical certainty to hasten or aggravate or cause a coronary insufficiency at that point in time.

*    *    *    *    *    *

"THE WITNESS:  Let me put it this way:  A lot would depend on whether on, say, autopsy there was another coronary, and if it were in a different place, in a different area, it's unrelated specifically to that pathology.  If nothing specifically was found that was different, but he had coronary insufficiency and died, this, in my mind, is a reasonable probability that it happened the way you said."

I read the medical testimony differently than the majority Dr. Bindelglas was cautious.  The sum and substance of his testimony was that unless an autopsy indicated something to the contrary, it was "a reasonable probability that it happened the way [the attorney] said."  Since no autopsy was performed which would have excluded non-industrial causes of death, the majority holds that the claimant failed to carry the burden of proof of establishing causation to a reasonable degree of medical certainty.  I do not agree.

It must be remembered, as the Court of Appeals stated, that in Industrial Commission cases an appellate court will consider the evidence in a light most favorable to sustaining the award.  The award will be disturbed only if it cannot be "reasonably supported on any reasonable theory of the evidence."  *Perry v. Industrial Commission*, 112 Ariz. 397, 398, 542 P.2d 1096, 1098

(1975); *Malinski v. Industrial Commission,* 103 Ariz. 213, 439 P.2d 485 (1968). Also:

"[A]n industrial injury need not be the sole cause of death, in order to entitle decedent's dependents to death benefits, as long as it appears that the injury contributed to and accelerated the inevitable." *Revles v. Industrial Commission,* 88 Ariz. 67, 74, 352 P.2d 759, 763 (1960).

The facts in this case show the heart attack can be traced to a definite time and place: that is, to a time when the deceased was engaged in what was for him "hard work" of a nature he did not usually perform. I can understand that a cautious medical doctor might prefer that there be an autopsy before expressing an opinion as to the cause of death. The reasoning of the majority in the instant case, however, may cause the hearing officer to require that an autopsy be performed in every heart attack case before possible alternative causes can be ruled out and the claimant found to have carried his burden of showing that death was due, at least in part, to an industrially related heart attack.

I believe that viewing the evidence in a light most favorable to upholding the decision of the referee, *Perry,* supra, there was sufficient evidence presented upon which the hearing officer could reasonably have found that there was a causal connection between the heart attack and the deceased's employment.

" * * * When medical opinion based on matters peculiarly within the realm of scientific knowledge are uncontroverted, as in the instant case, such opinion cannot be arbitrarily rejected by the Commission. (citation omitted)" *Enyart v. Industrial Commission,* 10 Ariz.App. 310, 314, 458 P.2d 514, 518 (1969).

Based upon Dr. Bindelglas' uncontradicted testimony, I believe the award of the hearing officer is reasonably supported by the evidence and should be affirmed.